Moses STRAUSS, et al., Plaintiffs,

v.

CREDIT LYONNAIS, S.A., Defendant.

Bernice Wolf, et al., Plaintiffs,

v.

Credit Lyonnais, S.A., Defendant.

Nos. 06–CV–702 (CPS)(KAM), 07–CV–914 (CPS)(KAM).

United States District Court, E.D. New York.

March 10, 2008.

Andrew David Friedman, Wechsler, Harwood, Halebian & Feffer, L.L.P., New York, NY, John M. Eubanks, Michael E. Elsner, Motley Rice LLC, Mount Pleasant, SC, Steven M. Steingard, Neil L. Glazer, Stephen H. Schwartz, Kohn Swift & Graf P.C., Philadelphia, PA, Aaron Schlanger, Gary M. Osen, Osen LLC, Oradell, NJ, David J. Strachman, Mcintyre, Tate, Lynch & Holt, Providence, RI, Peter Raven–Hansen, The George Washington University Law School, Washington, DC, for Plaintiffs.

Jonathan I. Blackman, Lawrence B. Friedman, Cleary, Gottlieb, Steen & Hamilton LLP, New York, NY, for Defendant.

### *MEMORANDUM AND ORDER*

MATSUMOTO, United States Magistrate Judge:

In the above-referenced actions, referred to the undersigned for general pretrial supervision pursuant to 28 U.S.C. § 636(b), plaintiffs, United States citizens, and the estates, survivors and heirs of United States citizens, who are victims of terrorist attacks in Israel allegedly perpetrated by the Islamic Resistance Movement ("HAMAS"),[1] allege that defendant Credit Lyonnais, S.A. ("defendant" or "Credit Lyonnais") is civilly liable for damages pursuant to 18 U.S.C. § 2333(a) for: (1) aiding and abetting the murder, attempted murder, and serious bodily injury of American nationals located outside the United States in violation of 18 U.S.C. § 2332; (2) knowingly providing material support or resources to a foreign terrorist organization[2] in violation of 18 U.S.C. § 2339B; and (3) financing acts of terrorism, in violation of 18 U.S.C. § 2339C. (*Strauss* 3d Am. Compl. at

---

[1] HAMAS is an acronym for "Harakat al-Muqawama al-Islammiyya," also known as "The Islamic Resistance Movement." (Doc. no. 127 in 06–cv–702, 3d Am. Compl., dated 1/28/08 ("*Strauss* 3d Am. Compl."), at ¶ 1 n. 1.)

[2] Pursuant to 8 U.S.C. § 1189, the Secretary of State may designate an organization a foreign terrorist organization if:

(a) the organization is a foreign organization;
(b) the organization engages in terrorist activity or terrorism, or retains the capability and intent to engage in terrorist activity or terrorism;
(c) the terrorist activity or terrorism of the organization threatens the security of United States nationals or the national security of the United States.

¶¶ 668–686; doc. no. 1 in 07–cv–914, Compl., dated 3/2/07 ("*Wolf* Compl.") at ¶¶ 407–425.)

Presently before the court are defendant's motions for protective orders [3] (doc. no. 116 in 06–cv–702; doc. no. 46 in 07–cv–914), filed on January 25, 2008, requesting that the court: (a) compel plaintiffs to seek discovery through the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, Mar. 18, 1970, 23 U.S.T. 2555, TIAS No. 7444 (the "Hague Convention"); and (b) excuse Credit Lyonnais from providing discovery protected under French bank secrecy laws [4] (*see* doc. no. 117 in 06–cv–702 at 1, Def.'s Memo. of Law in Support of its Motion for a Protective Order, filed 1/25/08 and doc. no. 47 in 07–cv–914 at 1, Def.'s Memo. of Law in Support of its Motion for a Protective Order, filed 1/25/08 (collectively, "Def.'s Memo.")). Both the *Strauss* and the *Wolf* plaintiffs oppose Credit Lyonnais's motions in briefs submitted to the court on January 25, 2008. (Doc. no. 121 in 06–cv–702, *Strauss* Plaintiff's Memo. of Law in Opp'n to Def.'s Motion ("*Strauss* Opp'n"); doc. no. 51 in 07–cv–914, *Wolf* Plaintiff's Memo. of Law in Opp'n to Def.'s Motion ("Wolf Opp'n").) In reply, Credit Lyonnais submitted identical briefs in both cases. (Doc. no. 123 in 06–cv–702 and doc. no. 52 in 07–cv–914, Def.'s Reply Br. in Further Support of Def.'s Motion for a Protective Order, dated 1/25/08 (collectively, "Def.'s Reply").) Most recently, the parties submitted letters (*see* doc. nos. 135–137 in 06–cv–702; doc. nos. 54, 56–57 in 07–cv–914) regarding a decision by the French Supreme Court, which the court has also considered.

In *Strauss v. Credit Lyonnais, S.A.,* 242 F.R.D. 199 (E.D.N.Y.2007) (Matsumoto, M.J.), in deciding cross-motions to compel discovery, the court addressed the issues presented by defendant's latest motions for protective orders. After evaluating Credit Lyonnais's virtually identical arguments regarding the various criminal, civil and disciplinary penalties Credit Lyonnais could face

if it adequately responded to plaintiffs' discovery requests, and after weighing and balancing the relative interests of the parties and the national interests of the United States and France, this court held that "the plaintiffs are entitled to Credit Lyonnais's responses" to plaintiffs' discovery demands. *Id.* at 228. Credit Lyonnais, nevertheless, brings the instant motions asserting that a July 18, 2007 letter it received from the French Ministry of Justice significantly changes the factual predicates of the court's decision in *Strauss.* The letter from the French Ministry of Justice generally recites the same French law this court evaluated in its *Strauss* opinion, states France's position that the Hague Convention provides "the exclusive and mandatory" means of obtaining evidence in the territory of France, and further states that discovery conducted outside the formal procedures of the Hague Convention would "clearly constitute a violation of the sovereignty of the French State." (doc. no. 118 in 06–cv–702 and doc. No 48 in 07–cv–914, Friedman Decl., Ex. A (the "French Ministry Letter") at 1; *see also* Def.'s Memo. at 2–3.) The French Ministry Letter also cites to the French blocking statute, article 1 bis of Law No. 68–678 of July 26, 1968, as amended by Law No. 80–538 of July 16, 1980, and a recent decision by the French Court of Appeals finding the defendant in that case guilty of violating the French blocking statute.

Credit Lyonnais further contends that this court's *Strauss* opinion "did not evaluate the criminal sanctions [Credit Lyonnais] would face if it were to disclose customer records or information covered by French bank secrecy laws, because it concluded, in reliance on mistaken precedents from courts in this Circuit that misconstrued French authorities on the subject, that French bank secrecy laws do not apply where the bank is a party to the litigation." (Cover letter to Def.'s Memo. at 3.) Credit Lyonnais requests that this court revisit its prior *Strauss* decision and rule that Credit Lyonnais need not produce docu-

---

**3.** Because defendant's motions are virtually identical, the court will address them together in this opinion, noting in the few instances where they differ in procedural posture, substance and requested relief.

**4.** Although Credit Lyonnais's briefs emphasize bank secrecy laws, its various submissions contain references to other French civil, criminal and disciplinary penalties that it may suffer. The court therefore takes the more comprehensive approach to considering French law and deciding defendant's motions.

ments in *Wolf* or deposition testimony in *Strauss* that will violate French bank secrecy laws.

After considering the foregoing submissions, and for the reasons set forth herein, defendant's motions for protective orders are denied.[5]

### BACKGROUND

Plaintiffs are individuals, and the estates, survivors and heirs of individuals who were injured or killed in twenty-one separate terrorist attacks,[6] allegedly perpetrated by HAMAS in Israel between March 28, 2002 and August 19, 2003. (*Strauss* 3d Am. Compl. at ¶¶ 5–575; *Wolf* Compl. at ¶¶ 5–313.) Plaintiffs allege that Credit Lyonnais is a financial institution incorporated and headquartered in France. (*Id.* at ¶ 1, respectively.) Plaintiffs further allege that Credit Lyonnais "conducts business in the United States and maintains an office at 601 Brickell Key Drive, Miami, Florida, 33131. Credit Lyonnais is registered with state banking authorities in Florida, and its Miami office is listed as its registered address." (*Id.* at ¶¶ 575 & 316, respectively.) Plaintiffs further allege that Credit Lyonnais maintained bank accounts in France for Le Comite de Bienfaisance et de Secours aux Palestinians ("CBSP"), and that although CBSP describes itself as a charitable organization, it is part of HAMAS's fundraising infrastructure and a member of the Union of Good. (*See Id.* at ¶¶ 615 & 357, respectively.) The Union of Good, plaintiffs maintain, is an organization established by the Muslim Brotherhood and comprised of more than fifty Islamic charitable organizations worldwide, and is a "principal fundraising mechanism for HAMAS." (*Id.* at ¶¶ 598–600 & 340–342, respectively.)

Plaintiffs base their claims on section 2333(a) of the Antiterrorism Act of 1992 (the "ATA"), codified at 18 U.S.C. § 2331 *et seq.*, which provides civil remedies for United States nationals injured in international terrorist attacks. Section 2333(a) states in relevant part:

> Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the costs of the suit, including attorney's fees.

18 U.S.C. § 2333(a).

"International terrorism," in turn, is defined by 18 U.S.C. § 2331(1) as activities that:

> (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
>
> (B) appear to be intended—
>
> > (i) to intimidate or coerce a civilian population;
> >
> > (ii) to influence the policy of a government by intimidation or coercion;
> >
> > (iii) to affect the conduct of a government by mass destruction, assassination or kidnaping; and
>
> (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum.

Title 18 U.S.C. § 2339B criminalizes support of formally designated terrorist organizations. It provides, in relevant part, that:

> Whoever knowingly provides material support or resources[7] to a foreign terrorist

---

5. Although the length of this opinion could be significantly reduced by incorporating by reference the court's May 25, 2007 *Strauss* opinion, the court chooses instead to include herein its full analysis for the benefit of the *Wolf* plaintiffs that have not had these specific issues addressed in their case against Credit Lyonnais. *See Strauss*, 242 F.R.D. 199 (E.D.N.Y.2007) (Matsumoto, M.J.). This order is also intended to give the parties continuing guidance as to the factors that this court will consider in future discovery disputes in order to obviate the need for repeti-

tive motion practice arising from issues related to those considered and decided once already in *Strauss*, and again herein.

6. Fifteen attacks are alleged in the *Strauss* 3d Am. Compl. and twelve attacks are alleged in the *Wolf* Compl., including six overlapping attacks.

7. "Material support or resources" is defined in 18 U.S.C. § 2339A(b)(1) as:

> any property, tangible or intangible, or service, including currency or monetary instruments or

organization, or attempts or conspires to do so, shall be fined ... or imprisoned ... or both.... To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization ... that the organization has engaged or engages in terrorist activity ... or that the organization has engaged or engages in terrorism....

18 U.S.C. § 2339B(a)(1).

Section 2339C, entitled "Prohibitions against the financing of terrorism, prohibits the financing of terrorists and provides in relevant part:

> Whoever ... by any means, directly or indirectly, unlawfully and willfully provides or collects funds with the intention that such funds be used, or with the knowledge that such funds are to be used, in full or in part, in order to carry out ... [an] act intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities in a situation of armed conflict, when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act, shall be punished....

18 U.S.C. § 2339C(a)(1).

In addressing defendant's motion to dismiss in both *Weiss v. National Westminster Bank PLC*, 453 F.Supp.2d 609, 613 (E.D.N.Y. 2006), and *Strauss v. Credit Lyonnais, S.A.*, 2006 WL 2862704, at *1 (E.D.N.Y., Oct. 5, 2006), Judge Sifton found that "[v]iolations of 18 U.S.C. § 2339B and § 2339C are recognized as international terrorism under 18 U.S.C. § 2333(a)." *See also Linde v. Arab Bank, PLC*, 384 F.Supp.2d 571, 580–581 (E.D.N.Y.2005) (finding that "plaintiffs have alleged that they were injured 'by reason of an act of international terrorism,' as required by Section 2333(a)"); *Boim v. Quranic Literacy Inst. and Holy Land Found. for Relief*

*and Dev.*, 291 F.3d 1000, 1014–1015 (7th Cir. 2002).

Plaintiffs allege that for more than thirteen years, defendant Credit Lyonnais "maintained an account for CBSP in Paris and provided HAMAS with material support in the form of financial services." (*Strauss* 3d Am. Compl. at ¶ 654; *Wolf* Compl. at ¶ 393.) Plaintiffs further allege that, through CBSP, Credit Lyonnais "knowingly transferred significant sums of money to HAMAS-controlled entities" and "knowingly ... provided material support ... to a designated FTO [Foreign Terrorist Organization], and has provided substantial assistance to HAMAS in the commission of acts of international terrorism in Israel, including the terrorist attacks that injured the plaintiffs." (*Id.* at ¶¶ 657, 660 & 396, 399, respectively.) Accordingly, plaintiffs contend that Credit Lyonnais is civilly liable to them for damages pursuant to 18 U.S.C. § 2333(a), for providing "material support and resources" to a Specially Designated Global Terrorist organization ("SDGT") (in violation of § 2339B) and providing or collecting funds "with the knowledge that such funds are to be used" to support terrorism (in violation of § 2339C). (*Id.* at ¶¶ 668–686 & 407–425, respectively.)

## PLAINTIFFS' DISCOVERY REQUESTS AT ISSUE

### A. *Wolf Plaintiffs' Discovery Requests.*

On August 7, 2007, the *Wolf* plaintiffs served Credit Lyonnais with their First Request for the Production of Documents. (Doc. no. 48 in 07–cv–914, Ex. E.) At issue are Document Request Nos. 1–3, 11–12 [8] and 18–19, in which plaintiffs request:

- No. 1: All account records maintained by or in the custody and control of Defendant that concern CBSP including account opening records, bank statements,

---

financial securities, financial services, lodging, training, expert advice or assistance, safe houses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

**8.** The court addressed nearly identical document request nos. 1–3 and 11–12 in *Strauss*. See 242

F.R.D. at 205. Indeed, the *Strauss* plaintiffs now possess documents responsive to those requests, including "in excess of 1000 pages of account records and correspondence" regarding Credit Lyonnais's former customer, CBSP, that Credit Lyonnais produced following this court's May 25, 2007 order compelling such production. (*Strauss* Opp'n at 3); *see also Id.*

wire transactions, deposit slips and correspondence between Defendant and CBSP.

- No. 2: All documents and communications by or to Defendant concerning CBSP, including all internal reports and the contents of any internal investigations undertaken by Defendant that reference CBSP.
- No. 3: All non-privileged documents and communications by or to the Defendant from or to banking regulatory authorities in the United States, the Republic of France, or the European Union ... concerning CBSP and/or accounts maintained by the Defendant on CBSP's behalf.
- No. 11: All documents concerning Defendant's decision in January 2002 to close CBSP's accounts maintained by Credit Lyonnais including any documents that were the catalyst or basis of any decision to close or freeze said accounts.
- No. 12: All documents concerning Defendant's actual closure of CBSP's accounts maintained by Credit Lyonnais including any documents that were the catalyst or basis of any decision to close or freeze said accounts.
- No. 18: All documents and things produced by the defendant to the plaintiffs in *Strauss, et al. v. Credit Lyonnais, S.A.*, CV 06–702–CPS–KAM.
- No. 19: All documents and things produced by the plaintiffs to the defendants in *Strauss, et al. v. Credit Lyonnais, S.A.*, CV 06–702–CPS–KAM.

(*Id.*)

The *Wolf* plaintiffs also served Credit Lyonnais on August 7, 2007, with their First Set of Interrogatories. (*Id.*, Ex. D.) The interrogatories at issue here are Nos. 2, 6, 8–9 and 11, which specifically request that Credit Lyonnais provide the following information:

- No. 2: Describe all steps that you took during January 2002 through September 2003 to close the CBSP's accounts maintained by Credit Lyonnais.
- No. 6: Please describe what steps you took upon designation of the CBSP as an SDGT regarding the freezing of CBSP funds, accounts and real property.

- No. 8: Describe Credit Lyonnais's role in transferring funds for CBSP and what fees, if any, Credit Lyonnais was paid for such services.
- No. 9: For the period of January 1, 1990 through December 31, 2003, did Credit Lyonnais's board of directors or any of the Bank's committees ever discuss CBSP and its connections to HAMAS or any other known, designated or suspected or [*sic*] Terrorist organization.
- No. 11: For every individual identified in Response A in your Initial Disclosures, please provide a detailed description of that individual's knowledge regarding Credit Lyonnais's banking relationship with CBSP and the official investigations by Credit Lyonnais of CBSP accounts.

(*Id.*)

### B. *Strauss Plaintiffs' Discovery Requests.*

On November 21, 2007, the *Strauss* plaintiffs served Credit Lyonnais with a Notice of Deposition pursuant to Federal Rule of Civil Procedure 30 that included 24 deposition topics and 5 requests for documents. (Doc. no. 118 in 06–cv–702, Ex. D.) At issue are Deposition Topic Nos. 22 and 23, and Document Request No. 5, in which plaintiffs request the following testimony and documents:

- Deposition Topic No. 22: Documents and data created and/or maintained in the United States of America by [Credit Lyonnais] or its parent company concerning any banking or financial services provided by [Credit Lyonnais] to, or for, Le Comite de Bienfaisance et de Secours aux Palestiniens ("CBSP"), The Association de Secours Palestinien ("ASP") and Khalid Al–Shuli (collectively, "Relevant Persons") and any accounts that were or are maintained by, or on behalf of, any such Relevant Persons, including, but not limited to, the following:

 a. The mechanism, process and procedures for executing or receiving fund transfers involving any such Relevant Persons;

 b. The roles of any persons in the United States in connection with the opening or closing of any such ac-

counts and the transfer of funds to and from these Relevant Persons; and

c. The production of documents relating to any such Relevant Persons by [Credit Lyonnais] to any governmental authority.

d. The identity of all [Credit Lyonnais] employees in the United States, France, Switzerland or the Palestinian Territories with knowledge of banking or financial services provided by CL to or for any of the Relevant Persons or who provided such services on behalf of [Credit Lyonnais] to, or for the benefit of, any Relevant Persons.

- Deposition Topic No. 23: Information maintained by [Credit Lyonnais] that is relevant to the claims asserted in this action including, but not limited to, information concerning any banking or financial services provided by [Credit Lyonnais] to CBSP and/or any other Relevant Persons that was deleted, physically destroyed, corrupted, damaged, lost, or overwritten, and whether this information was lost pursuant to the data retention and destruction policy.

- Doc. Request No. 5: All documents concerning CBSP, ASP, and/or Khalid Al-Shuli generated or maintained in the United States.

(Doc. no. 118 in 06–cv–702, Friedman Decl., Ex. D.)

## CREDIT LYONNAIS'S MOTIONS FOR PROTECTIVE ORDERS

Credit Lyonnais seeks protective orders pursuant to Federal Rule of Civil Procedure 26(c), which provides in relevant part:

A party or any person from whom discovery is sought may move for a protective order. . . . The motion must include a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action. The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . .

A party seeking a protective order under Rule 26(c) has the burden of establishing "good cause." *Gambale v. Deutsche Bank AG,* 377 F.3d 133, 142 (2d Cir.2004). In addition, a party seeking the application of the Hague Convention procedures, rather than the Federal Rules of Civil Procedure, bears the burden of persuasion. *See, e.g., Valois of Am., Inc. v. Risdon Corp.,* 183 F.R.D. 344, 346 (D.Conn.1997).

### A. The Bases for Credit Lyonnais's Motions for Protective Orders.

Credit Lyonnais objects to the plaintiffs' above-quoted discovery requests primarily on the basis that the requests seek in whole or in part the discovery or disclosure of information that is protected by the French bank secrecy statute, "Article L 511–33 of the French Monetary and Financial Code, which prohibits banks from disclosing confidential information regarding any existing or former customer, including but not limited to the customer's name, account information, and transfers into and from the account by and to third parties." (Doc. no. 117, Friedman 06–cv–702 Cover Letter at 3; doc. no. 47, Friedman 07–cv–914 Cover Letter at 2.) A violation of this statute, Credit Lyonnais claims, "is a criminal offense under French law, and is sanctionable by imprisonment and a substantial monetary penalty under Article 226–13 of the French Criminal Code." (*Id.*)

Although the court addressed this precise issue in *Strauss,* 242 F.R.D. 199, Credit Lyonnais contends that the court relied "on mistaken caselaw that misconstrued French authorities" and that "the Court did not consider the criminal sanctions [Credit Lyonnais] would face by disclosing information in violation of those French bank secrecy laws." (Def.'s Memo. at 5.) In support of its renewed arguments, Credit Lyonnais proffers documents that purportedly alter the factual bases for this court's prior opinion in *Strauss:* (1) a July 18, 2007 letter from the French Ministry of Justice's Assistant Director of Economic Law, Carole Arrighi de Casanova, discussing the Hague Convention and French criminal law (the French Ministry Letter); (2) an opinion of the Paris Court of Appeals, cited in the French Ministry

Letter, overruling an acquittal of a lawyer who sought "information of an economic, commercial, industrial, financial or technical nature as evidence" located in France "in violation of the rules established by the Hague Convention" on the taking of evidence abroad (*Id.*, Ex. C ("*In re Christopher A.*")), affirmed by the French Supreme Court in an opinion dated December 12, 2007 (*see* doc. no. 135 in 06–cv–702; doc. no. 57 in 07–cv–914); and (3) a supplemental declaration of defendant's French law expert Chantal Cutajar (doc. no. 119 in 06–cv–702 and doc. no. 49 in 07–cv–914, Suppl. Cutajar Decl., dated 10/24/07 (collectively, "Suppl. Cutajar Decl.")), which incorporates by reference her prior *Strauss* declaration (doc. no. 119, Annex 1, in 06–cv–702 and doc. no. 49, Annex 1, in 07–cv–914, Expert Decl. of Chantal Cutajar, dated 12/14/06 (collectively, "Cutajar Decl.")). The court considers defendant's proffered documents in turn.

### 1. *The French Ministry Letter.*

As noted in the court's May 25, 2007 order, the French government had previously failed to respond to two letters and one telephone inquiry from Credit Lyonnais, seeking its view on the disputed discovery. After Credit Lyonnais forwarded to the French Ministry of Justice this court's May 25, 2007 order in *Strauss* compelling Credit Lyonnais to produce documents and information responsive to the *Strauss* plaintiffs' discovery demands, the French Ministry of Justice responded by letter, specifically referencing the *Strauss* action and advising Credit Lyonnais of:

· the position of the Republic of France *as to the exclusive and mandatory nature of the recourse to the provisions of The Hague Convention* ... when it is a matter for a judicial authority of a State to obtain evidence in another State that is also bound by that instrument. Thus, any search for evidence in the territory of France by foreign authorities that would be conducted outside a duly formalized request for judicial mutual aid would clearly constitute a violation of the sovereignty of the French State.

· Moreover, French criminal law prevents the search and disclosure by any person of economic, commercial, industrial, financial or technical documents or information that are to constitute evidence for foreign judicial or administrative proceedings ... subject to criminal penalties of imprisonment and fine

(French Ministry Letter at 1–2) (emphasis in original) (footnote omitted). Notably, the French Ministry Letter does not object to any of the plaintiffs' specific discovery requests for documents or information.

### 2. *The Paris Court of Appeals Decision.*

The French Ministry Letter cites as illustrative of these potential penalties a March 28, 2007 decision of the Paris Court of Appeals that "found an ... attorney, in charge of a civil action brought in the United States of America, guilty of the crime of disclosure of economic, commercial, industrial, financial or technical documents or information that are to constitute evidence for a foreign proceeding," in violation of article 1 bis of Law No. 68–678 of July 26, 1968, as amended by Law No. 80–538 of July 16, 1980, "and ordered him to pay a fine of 10,000 euros." [9] (*Id.* at 2; *see also In re Christopher A.* at 4.)

### 3. *The Cutajar Declarations on French Civil and Criminal Law.*

Credit Lyonnais also submitted two declaration of French law professor Chantal Cutajar, one dated November 14, 2006, on which Credit Lyonnais relied in opposition to the *Strauss* plaintiffs' motion to compel, *see* 242 F.R.D. 199, and a supplemental declaration dated October 24, 2007, criticizing this court's *Strauss* decision, in particular the court's citations to and reliance on *Bodner v. Paribas*, 202 F.R.D. 370 (E.D.N.Y.2000) and *Alfadda v. Fenn*, 149 F.R.D. 28 (S.D.N.Y.1993), for the proposition that "French bank secrecy law, codified at Article L 511–33 of the Monetary and Financial Code, is not intended to apply to litigation in which the bank is a party." *Strauss*, 242 F.R.D. at 220 (quotation and citations omitted). Cutajar contends that the foregoing cases, upon which

---

**9.** On February 20, 2008, Credit Lyonnais submitted a certified translation of an opinion by the French Supreme Court, dated December 12, 2007, affirming *In re Christopher A.* (See doc. no. 135 in 06–cv–702; doc. no. 57 in 07–cv–914).

the court relied, incorrectly interpret French law. (Suppl. Cutajar Decl. at 1) Moreover, neither Cutajar nor Credit Lyonnais offers any explanation for failing to provide the court with that position during the parties' first round of briefing, prior to the court's May 25, 2007 order. As Cutajar summarizes in paragraph 3 of her supplemental declaration:

> For [Credit Lyonnais] to be released from its duty of professional secrecy when it is a party to the litigation, it is essential that its client also be a plaintiff in the proceedings (I). If the bank violated its duty of professional secrecy, it would expose itself to civil and criminal sanctions (II). The Hague Convention of May 18, 1970, is the only process for obtaining disclosures of documents between foreign countries, however this disclosure must comply with the internal law of the signatory States. It does not allow the disclosure of documents or information covered by bank secrecy (III).

(*Id.*) Cutajar claims that "as long as CBSP, the bank's [former] client, has not authorized CREDIT LYONNAIS to disclose the documents requested by plaintiffs, CREDIT LYONNAIS will not be released from its duty of professional secrecy and any disclosure on its part would constitute a criminally, disciplinarily and civilly punishable violation." (*Id.*) The cases cited by Cutajar, however, do not specifically support her position that the bank's client must be a plaintiff in order for a defendant bank to be released from its secrecy obligations.

Cutajar's supplemental declaration also recites the same civil and criminal sanctions that would apply to Credit Lyonnais if it were to comply with plaintiffs' discovery requests. (*See* Suppl. Cutajar Decl.) The entirety of Cutajar's list of potential liability has already been presented to, considered, and decided by this court. *See Strauss,* 242 F.R.D. at 218–227. Notwithstanding the further and unfortunate expenditure of judicial resources to revisit issues already decided, the court does so reluctantly to address defendant's claim that the French Ministry's letter materially alters the factual bases of the court's May 25, 2007 order.

### B. *Credit Lyonnais's Requested Relief.*

Based on the foregoing submissions, Credit Lyonnais seeks an order in both *Strauss* and *Wolf:* (1) compelling plaintiffs to seek their requested discovery through the Hague Convention; and (2) excusing Credit Lyonnais from producing documents or providing other discovery that Credit Lyonnais claims is protected under French bank secrecy laws. (Doc. no. 117, Friedman 06–cv–702 Cover Letter at 1; doc. no. 47, Friedman 07–cv–914 Cover Letter at 1.) As discussed below, the court denies both of these requests for relief.

### DISCUSSION

### A. *Applicability of French Civil and Criminal Laws.*

Plaintiffs do not contest Credit Lyonnais's position that the documents, interrogatory responses and testimony they seek are at least partially implicated by French civil and criminal laws. The court will nevertheless analyze whether Credit Lyonnais has met its "burden of demonstrating that such law actually bars the production or testimony at issue" and that Credit Lyonnais will suffer "undue burden or expense" if it complies with its court ordered discovery obligations as prescribed by the Federal Rules of Civil Procedure. *Alfadda,* 149 F.R.D. at 34; Fed. R.Civ.P. 26(c). Cutajar generally describes in her previous declaration the liability that Credit Lyonnais faces:

> *First,* CREDIT LYONNAIS is subject to the obligations of bank secrecy under French law.... [A]bsent such a waiver [by its customer], CREDIT LYONNAIS is legally bound to maintain the confidentiality of customer information, and would be subject to criminal liability if it failed to do so. *Second,* CREDIT LYONNAIS is subject to obligations of professional confidentiality intended to protect the vital interests of France and to ensure the efficacy of the French legislative and regulatory procedures aimed at combating money laundering and the financing of terrorism.... *Third,* persons in France who provide to French legal authorities information regarding preliminary criminal investigations are also subject to obligations of profes-

sional confidentiality, and are subject to criminal penalties if they violate those obligations.

(Cutajar Decl. at ¶ 7.)

More specifically, Cutajar's supplemental declaration states in relevant part:

- Violation of bank secrecy is a criminal offense punishable by one year of imprisonment and a fine of Q 15,000 pursuant to article L. 511–33 of the Monetary and Financial Code. . . .
- Failure to comply with the law of July 26, 1968 [Law No. 68–678], which prohibits the disclosure of documents and information to foreign government authorities, is punishable under article 3 by six months of imprisonment and/or a fine of Q 18,000.
- Violation of the secrecy of investigation to which Credit Lyonnais is subject pursuant to article 11 of the Criminal Procedure Code is punished by article 58 of the Criminal Procedure Code by a fine of Q 4,500 and a term of imprisonment of two years if a document resulting from a court-ordered search is disclosed without the authorization of the document's signatory or addressee to a person not authorized by law to receive it.
- The disclosure of information resulting from an investigation or an inquiry in progress could expose the person making the disclosure to the sanctions set forth by article 434–7–2 of the criminal code, namely, two years of imprisonment and a fine of Q 30,000, and up to 5 years of imprisonment and a fine of Q 75[,]000.
- If Credit Lyonnais does not comply with its duty of secrecy, it will also incur civil liability. It would then be forced to pay a sum of money to the client who suffered an injury as a result of the violation of professional secrecy.
 - The bank may incur civil liability in tort for wrongdoing if it reveals information of a confidential nature about a person to whom it is not bound or to whom it is no longer bound by contract. If the person suffers an injury due to the revelation of confidential information, it may then obtain damages for this injury.

(Cutajar Suppl. Decl. at ¶¶ 16–21) (footnotes omitted.) Cutajar further asserts, again without citing specific authority, that

"CREDIT LYONNAIS would not be exempted from its criminal liability by invoking an obligation imposed on it by an American judge to disclose information that was covered by bank secrecy." (Cutajar Decl. at ¶ 16.)

Here, plaintiffs, in part, seek precisely the sort of information protected by French bank secrecy obligations, anti-money laundering and anti-terrorism laws, and information related to criminal investigations: *e.g., inter alia,* "[a]ll non-privileged documents and communications by or to the Defendant from or to banking regulatory authorities in the United States, the Republic of France, or the European Union ... concerning CBSP and/or accounts maintained by the Defendant on CBSP's behalf." (Doc. no. 48 in 07–cv–914, Ex. E.) Thus, for the purposes of this motion, Credit Lyonnais has sufficiently met its burden to establish that "the discovery sought is indeed prohibited by foreign law." *Alfadda,* 149 F.R.D. at 34.

**B. *The Factors In Restatement § 442(1)(c), Aerospatiale and Minpeco Do Not Support Imposing Protective Orders.***

■ When evaluating a motion for a protective order to prevent discovery of documents and information "in the face of objections by foreign states," *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for the Southern Dist. of Iowa,* 482 U.S. 522, 544 n. 28, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987), courts in the Second Circuit consider the following five factors elucidated by the Supreme Court in *Aerospatiale* and set forth in the Restatement (Third) of Foreign Relations Law of the United States § 442(1)(c):

(1) the importance to the ... litigation of the documents or other information requested;

(2) the degree of specificity of the request;

(3) whether the information originated in the United States;

(4) the availability of alternative means of securing the information; and

(5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine the

important interests of the state where the information is located.

*British Int'l Ins. Co., Ltd. v. Seguros La Republica, S.A.,* No. 90 Civ. 2370, 2000 WL 713057, at *8–9 (S.D.N.Y. June 2, 2000) (citing *Aerospatiale,* 482 U.S. at 544 n. 28, 107 S.Ct. 2542 (quoting tentative draft of Restatement of Foreign Relations Law of the United States (Revised) § 437(1)(c), subsequently adopted as Restatement (Third) of Foreign Relations Law of the United States, § 442(1)(c))). Courts in the Second Circuit also consider "the hardship of compliance on the party or witness from whom discovery is sought [and] the good faith of the party resisting discovery." *Minpeco S.A. v. Conticommodity Servs., Inc.,* 116 F.R.D. 517, 523 (S.D.N.Y.1987); *Reino De Espana v. Am. Bureau of Shipping,* No. 03 Civ. 3573, 2005 WL 1813017, at *3 (S.D.N.Y. Aug.1, 2005).

In *Minpeco,* the court identified seven factors relevant to a foreign discovery analysis, and then highlighted four of those as the "principal factors": [10]

(1) the competing interests of the nations whose laws are in conflict,

(2) the hardship of compliance on the party or witness from whom discovery is sought,

(3) the importance to the litigation of the information and documents requested, and

(4) the good faith of the party resisting discovery.

*Minpeco,* 116 F.R.D. at 523. Two of those factors—the competing national interests of each nation, and the importance to the litigation of the requested discovery—are also identified in the Restatement. In reconciling these factors, the Southern District of New York explained:

This Circuit thus considers two factors—hardship of compliance and good faith—not listed by the Supreme Court. . . .

[T]his Court will consider each of these seven factors, giving the most weight to the fifth *[Aerospatiale]* factor—the balance of national interests—"as it directly addresses the relations between sovereign nations."

*Reino De Espana,* 2005 WL 1813017, at *3 (quoting *Madanes v. Madanes,* 186 F.R.D. 279, 286 (S.D.N.Y.1999)).

Although the Republic of France has not specifically objected to plaintiffs' discovery requests, thus triggering application of the factors set forth in the Restatement and American case law, this court will follow Second Circuit cases which apply all five factors enumerated by the Supreme Court and the Restatement, and the two additional "principal" factors identified in *Minpeco:* the hardship of compliance on the party from whom discovery is sought, and the resisting party's good faith. 116 F.R.D. at 523; *see also In re Grand Jury Subpoena dated Aug. 9, 2000,* 218 F.Supp.2d 544, 554 (S.D.N.Y.2002) ("[T]he Second Circuit applies a balancing test distilled from the Restatement of the Foreign Relations Law of the United States, and has endorsed consideration of the *[Minpeco]* factors. . . . The *[Minpeco]* analysis is broad, and may encompass additional considerations—whether they are enumerated separately or considered as part of the four *Minpeco* factors."); *Reino De Espana,* 2005 WL 1813017, at *3 (considering all seven factors); *Madanes,* 186 F.R.D. at 285–286; *British Int'l Ins.,* 2000 WL 713057, at *8–9.

### 1. *The Requested Information is Crucial to the Litigation.*

 Consistent with the Federal Rules of Civil Procedure, Restatement § 442(1)(c) requires that the court examine the relevance of the requested discovery to the litigation:

---

**10.** In addition to the four "principal" factors, the *Minpeco* court also identified three additional factors, which this court has designated as the three "minor" *Minpeco* factors:

[1] the extent to which the required conduct is to take place outside of the United States, [2] the nationality of the [entity], and [3] the extent to which enforcement by action of either state can reasonably be expected to achieve compliance with the rule prescribed by that state. *Minpeco,* 116 F.R.D. at 522. The court notes that it has already considered one of the three

minor Minpeco factors—"the nationality of the [entity]"—as it has identified Credit Lyonnais as a financial institution incorporated and headquarted in France, and registered to do business in the United States. (*See supra* Background.) The court will consider the first minor factor, the extent to which the required conduct is to take place outside the United States, *infra* at n. 12. The defendant concedes that minor factor 3 "is not applicable." (Def.'s Memo. at 17) (referring to minor factor 2 but quoting minor factor 3); *see also Minpeco,* 116 F.R.D. at 522.

In deciding whether to issue an order directing production of information located abroad, and in framing such an order, a court or agency in the United States should take into account the importance to the investigation or litigation of the documents or other information requested....

Rst. § 442(c).[11]

In this case, plaintiffs seek documents and information relevant to Credit Lyonnais's knowledge of CBSP's alleged terrorist connections and the extent of the bank's financial services in support of CBSP's alleged terrorist acts. Indeed, Credit Lyonnais has conceded in its prior submissions, and this court agrees, that "the documents and information sought by plaintiffs," the majority of which are identical or substantially similar to that previously sought and obtained by the *Strauss* plaintiffs, "are undeniably of potential importance to the outcome of this litigation." (Doc. no. 61 in 06–cv–702, Def.'s Opp. to Motion to Compel, filed 12/18/06 ("Def.'s *Strauss* Opp'n"), at 23.) The information plaintiffs seek regarding the CBSP account(s) is crucial and relevant to plaintiffs' claims pursuant to 18 U.S.C. §§ 2333(a), 2339B and 2339C, which require plaintiffs to demonstrate that (1) they were injured by an act of international terrorism (pursuant to Section 2331(a)); (2) defendant "knowingly provided material support and/or resources" to a designated terrorist (in violation of Section 2339B); and (3) defendant "willingly provid[ed] or collect[ed] funds" used to carry out terrorist acts (in violation of Section 2339C). *See* 18 U.S.C. §§ 2339B, 2339C; *Linde,* 384 F.Supp.2d at 588.

Rule 26(b)(1) of the Federal Rules of Civil Procedure provides, "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense ... Relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Because the scope of civil discovery in the United States is broader than that of many foreign jurisdictions, some courts have applied a more stringent test of relevancy when applying the Federal Rules to foreign discovery. *See Ae-*

*rospatiale,* 482 U.S. at 542, 546, 107 S.Ct. 2542 (noting that the requested documents were "vital" to the litigation, and advising U.S. courts that "[w]hen it is necessary to seek evidence abroad ... the district court must supervise pretrial proceedings particularly closely to prevent discovery abuses"); *see also Richmark Corp. v. Timber Falling Consultants,* 959 F.2d 1468, 1475 (9th Cir. 1992) ("Where the outcome of the litigation 'does not stand or fall on the present discovery order,' ... courts have generally been unwilling to override foreign secrecy laws.") (quoting *In re Westinghouse Elec. Corp. Uranium Contracts Litig.,* 563 F.2d 992, 999 (10th Cir.1977)); Rst. § 442, comment (a) (the discovery must be "directly relevant and material"); *but see Compagnie Francaise d'Assurance Pour le Commerce Exterieur v. Phillips Petroleum Co.,* 105 F.R.D. 16, 32 n. 8 (S.D.N.Y.1984) ("In ordering production of these documents, this Court does not need to find, nor can it find at this point, that the requested documents are 'vital'...."); *Graco, Inc. v. Kremlin, Inc.,* 101 F.R.D. 503, 515 (N.D.Ill.1984) (noting that *Aerospatiale* indicated that the requested discovery should be "vital," but declining to articulate a standard).

Given plaintiffs' allegations regarding Credit Lyonnais's provision of financial services to CBSP for more than thirteen years, including accepting deposits from and/or distributing funds to alleged terrorist organizations on behalf of CBSP (*see generally Strauss* 3d. Am. Comp.; *Wolf* Compl.), the court finds that the discovery sought is both relevant and vital to the litigation of plaintiffs' claims. Because the documents, information and testimony sought by plaintiffs are highly relevant and important to the claims and defenses in this action, the court finds that this first factor weighs heavily in plaintiffs' favor.

### 2. *The Discovery Requests are Narrowly Tailored.*

Restatement § 442(1)(c) also provides, "a court or agency in the United States should take into account ... the degree of specifici-

---

**11.** Although the language of the Restatement is phrased in terms of orders directing production, it is similarly relevant in the context of a motion for a protective order.

ty of the request...." Here, the court finds that the requested discovery is relevant, vital and narrowly tailored to the litigation. See *Compagnie Francaise*, 105 F.R.D. at 32 n. 8; *Graco*, 101 F.R.D. at 515. As noted above, at issue are *Wolf* Document Requests Nos. 1–3, 11–12 and 18–19, Interrogatory Nos. 2, 6, 8–9 and 11, and *Strauss* 30(b)(6) Deposition Notice Topic Nos. 22–23 and Document Request No. 5. Plaintiffs' discovery requests are sufficiently focused on the vital issues in this case: whether and to what extent Credit Lyonnais knowingly provided "material support and resources" to Specially Designated Global Terrorist organizations, and/or "financial services" to a terrorist organization. 18 U.S.C. §§ 2339B, 2339C. Plaintiffs' discovery requests seek, *inter alia*, documentation of and testimony regarding the relationship between defendant and CBSP, the nature and extent of the services that defendant provided to CBSP, the collection or distribution of funds by Credit Lyonnais that may have been used by CBSP and/or its associates to support terrorism, and Credit Lyonnais's knowledge of CBSP's alleged terrorist connections. Plaintiffs require this information to establish liability pursuant to 18 U.S.C. §§ 2339B, 2339C. *Cf. Trade Dev. Bank v. Cont'l Ins. Co.*, 469 F.2d 35, 40–41 (2d Cir.1972) (denying defendant's discovery requests for the identities of Swiss bank account customers because such identities were irrelevant to whether a bank employee had used customer accounts "in furtherance of his fraudulent scheme"); *In re Two Grand Jury Subpoenas Duces Tecum Served Upon Union Bank of Switzerland*, 158 Misc.2d 222, 601 N.Y.S.2d 253 (N.Y.Sup.Ct.1993) (denying the government's discovery requests, in part, because the District Attorney "conceded that the subpoenaed material is not crucial to his Grand Jury presentation").

Plaintiffs also seek information, documents and testimony regarding documents created and/or maintained in the United States, and defendant's document retention and destruction policies. Plaintiffs have established, and Credit Lyonnais has not contested in its submissions, that plaintiffs' discovery demands are specifically tailored to their claims and the defenses in this action.

### 3. The Majority of the Requested Discovery Originated Outside the United States.

The parties do not appear to dispute that the majority of the requested discovery originated outside the United States, but do not address whether the documents may be retrieved in the United States.[12] Thus this origination factor, except as noted below in footnote 12, would seem to favor defendant.

This case presents a somewhat unique situation, however, because the *Strauss* plaintiffs have already received "in excess of 1000 pages of [CBSP] account records and correspondence" in response to the *Strauss* plaintiffs' prior discovery requests, which are substantially identical to the *Wolf* plaintiffs' outstanding discovery requests at issue here. (*Strauss* Opp'n at 3.) Those documents are now in the possession and control of counsel for the *Strauss* plaintiffs pursuant to the

---

**12.** Defendant claims that "[a]ll of the documents requested are located in France, and, thus may only be obtained in France" but defendant does not address directly "whether the requested bank records that originated in France could be retrieved electronically by Credit Lyonnais at its Miami location" or elsewhere in the United States. *Strauss*, 242 F.R.D. at 210 n. 7 (referring to minor *Minpeco* factor 1, 116 F.R.D. at 522). With respect to the requested discovery that does not fall within the category of previously produced documents, such as the *Strauss* plaintiffs' Rule 30(b)(6) deposition notice and accompanied document requests, Credit Lyonnais contends that France is the situs of those documents and where the witness it intends to designate as its Rule 30(b)(6) witness resides. (Def.'s Reply at 1.) Plaintiffs do not appear to dispute this contention, however, plaintiffs have noticed the Credit Lyonnais 30(b)(6) deposition for London, U.K. Moreover, the court notes that *Strauss* Document Request No. 5, which seeks "[a]ll documents concerning CBSP, ASP, and/or Khalid Al–Shuli generated or maintained in the United States," does not present the same degree of conflict with French law.

The court also notes that Credit Lyonnais refers to the witness it intends to designate pursuant to Federal Rule of Civil Procedure 30(b)(6) as "the noticed Rule 30(b)(6) witness," however, Credit Lyonnais, not plaintiffs, has control of what witness(es) it designates. *See* Fed.R.Civ.P. 30(b)(6) ("The named organization must then designate one or more agents ..."). Credit Lyonnais does not assert that it cannot produce a Rule 30(b)(6) witness who resides outside of France and could testify after a review of relevant records.

terms of a protective order. (Doc. no. 122 in 06–cv–702 at 1; doc. no. 27 in 07–cv–914.) Credit Lyonnais thus requests, without objection from the *Strauss* plaintiffs, that if this court were to deny defendant's motions for protective orders, the court order the *Strauss* plaintiffs to produce to the *Wolf* plaintiffs that which the *Strauss* plaintiffs have already received from the defendant. (Friedman 07–cv–914 Cover Letter at 4.) Credit Lyonnais asserts that this method would obviate "the untenable position of exposing itself to criminal sanctions for violating French laws." (*Id.*) The court declines to order such relief because of the implications such an order may have with respect to the on-going discovery in these cases. This court has already considered many of the same arguments asserted by Credit Lyonnais's instant motions and ruled with respect to Credit Lyonnais's discovery obligations in Strauss, and the court does not find the conditions to have changed so significantly as to disturb that ruling. The parties are of course free to agree, without a court order, that the *Strauss* plaintiffs produce to the *Wolf* plaintiffs documents they received from Credit Lyonnais pursuant to the court's May 25, 2007 Memorandum and Order.

### 4. *Availability of Alternative Methods: Plaintiffs Are Not Required to Seek Discovery Initially or Exclusively Through the Hague Convention.*

Section § 442(1)(c) of the Restatement also requires the court to consider the "availability of alternate means of securing the information...." The court notes that plaintiffs do not have direct or ready access to Credit Lyonnais's records through means other than discovery demands. Only Credit Lyonnais can provide plaintiffs with complete responses to their requested discovery pursuant to the Federal Rules of Civil Procedure, as it acknowledges that certain discovery would not be granted under the Hague Convention. (See Def.'s Memo. at 4, 17.)

Credit Lyonnais requests an order "compelling plaintiff to seek discovery from [Credit Lyonnais] by employing the procedures of the Hague Convention," a treaty that pro-

vides procedures for signatories to conduct discovery in foreign states to which both France and the United States are signatories. (Doc. no. 117, Friedman 06–cv–702 Cover Letter at 1; doc. no. 47, Friedman 07–cv–914 Cover Letter at 1.) As a signatory to the Hague Convention, France generally has agreed to produce documents sought by foreign courts by responding to letters rogatory from the requesting party,[13] and, through its Ministry of Justice, asserts that recourse to the connection is "exclusive and mandatory." (French Ministry Letter at 1.)

Contrary to the French position, the United States Supreme Court, in *Aerospatiale,* determined that parties seeking discovery need not resort to the Hague Convention as their first or exclusive means for securing foreign discovery, explaining:

> An interpretation of the Hague Convention as the exclusive means for obtaining evidence located abroad would effectively subject every American court hearing a case involving a national of a [signatory] state to the internal laws of that state. Interrogatories and document requests are staples of international ... litigation, no less than of other suits, yet a rule of exclusivity would subordinate the court's supervision of even the most routine of these pretrial proceedings to the actions or, equally, to the inactions of foreign judicial authorities.

482 U.S. at 539, 107 S.Ct. 2542. The Court thus found that "the Hague Convention [does] not deprive the District Court of the jurisdiction it otherwise possessed to order a foreign national party before it to produce evidence physically located within a signatory nation." *Id.* at 539–540, 107 S.Ct. 2542. The Court "decline[d] to hold as a blanket matter that comity requires resort to Hague Evidence Convention procedures without prior scrutiny in each case of the particular facts, sovereign interests, and likelihood that resort to those procedures will prove effective." *Id.* at 544, 107 S.Ct. 2542. Addressing the applicability of French blocking statutes, the Court continued,

> It is clear that American courts are not required to adhere blindly to the directives

---

**13.** *See* Hague Conference on Private Int'l Law, http://hcch.e-vision.nl/index—en.php?act=

conventions.status & cid=41 (last visited Feb. 4, 2008).

of [a foreign blocking statute]. Indeed, the language of the statute, if taken literally, would appear to represent an extraordinary exercise of legislative jurisdiction by the Republic of France over a United States district judge, forbidding him or her to order any discovery from a party of French nationality, even simple requests for admissions or interrogatories that the party could respond to on the basis of personal knowledge.... Extraterritorial assertions of jurisdiction are not one-sided.

*Id.* at 544 n. 29, 107 S.Ct. 2542.

Defendant's argument that American courts must defer and be subject to internal French law contravenes American law. Therefore, as previously ruled in *Strauss,* plaintiffs need not seek discovery initially or exclusively through the Hague Convention. Although this fourth factor weighs in plaintiffs' favor, the court reiterates that even though plaintiffs are not required to resort to the Hague Convention, they are certainly not, and have never been, discouraged from doing so.

**5. *The Mutual Interests of the United States and France in Combating Terrorism Favor Disclosure and Outweigh the French Interest, If Any, In Protecting the Disputed Discovery.***

The comity factor—requiring analysis of the competing interests of the United States and France—"is of the greatest importance in determining whether to defer to the foreign jurisdiction." *British Int'l Ins.,* 2000 WL 713057, at *9. The court again finds that this factor weighs in favor of plaintiffs. The interests of the United States and France in combating terrorist financing, as evidenced by the legislative history of the ATA, codified at 18 U.S.C. § 2331 *et seq.,* Presidential Executive Orders, and both countries' participation in international treaties and task forces aimed at disrupting terrorist financing, outweigh the French interest in bank secrecy laws and its generally-asserted interest in "sovereignty." (*See* French Ministry Letter at 1.) France's national interest in having Credit Lyonnais respond to plaintiffs' discovery requests is evident from France's execution of international treaties facilitating international cooperation to combat terrorism, and its requirement that banks monitor

and report customer ties to terrorists. Despite numerous and ample opportunities to do so, the French Ministry of Justice has not specifically objected to the plaintiffs' discovery demands. Rather, the French Ministry of Justice merely restates French law, and vaguely notes French sovereignty, but fails to address how its interest in combating terrorist funding should be reconciled. Nor does the French Ministry of Justice provide any ground for refuting the court's conclusion that the balance of interests at stake in this case favor production of the relevant information.

**(a) *The United States's Interest.***

"The extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine the important interests of the state where the information is located," is the most important of the five factors in Rst. § 442(1)(c). *See British Int'l Ins.,* 2000 WL 713057, at *9–10; *Madanes,* 186 F.R.D. at 286; *Minpeco,* 116 F.R.D. at 522.

It is axiomatic that the United States has "a substantial interest in fully and fairly adjudicating matters before its courts." *Minpeco,* 116 F.R.D. at 523–524; *see also Alfadda,* 149 F.R.D. at 34; *In re Westinghouse,* 563 F.2d at 999. When that interest is combined with the United States's goals of combating terrorism, it is elevated "to nearly its highest point," and diminishes any competing interests of the foreign state. *Dammarell v. Islamic Republic of Iran,* No. Civ. A. 01–2224, 2005 WL 756090, at *20 (D.D.C. Mar. 29, 2005) (finding that injuries resulting from "a state-sponsored terrorist attack on a United States embassy and diplomatic personnel ... heighten the interest of a domestic forum and diminish the interest of the foreign state").

The legislative history of the ATA, Executive Orders signed by two United States Presidents, and the participation by the United States in international treaties and an international task force, establish this country's profound and compelling interest in combating terrorism at every level, including disrupting the financial underpinnings of ter-

rorist networks. Section 2333(a) of United States Code Title 18 was first introduced in the wake of *Klinghoffer v. Palestine Liberation Org.*, 739 F.Supp. 854 (S.D.N.Y.1990), in which heirs of an American national killed in a terrorist attack in the Mediterranean sued the Palestinian Liberation Organization. (See Br. for United States as Amicus Curiae Supporting Resp's at *6, *Boim*, 291 F.3d 1000 (7th Cir.2002) (No. 01–1969).) The *Klinghoffer* court concluded that it had subject matter jurisdiction because United States admiralty laws applied to plaintiff's tort claims. *See Klinghoffer*, 739 F.Supp. at 858–59, *vacated on other grounds by* 937 F.2d 44 (2d Cir.1991). As the *Strauss* plaintiffs' expert [14] explains, "the narrowness of the grounds on which [jurisdiction] was resolved[,] made it clear to observers that legislation would be needed to expand federal court jurisdiction in order to facilitate comparable suits by other victims of terrorism outside the United States." (Doc. no. 62–3 in 06–cv–702, Expert Decl. of Robert M. Chesney, Esq. in Support of Pls.' Motion to Compel, dated 12/18/06 ("Chesney Decl."), at 9.)

To address the need to expand federal jurisdiction for the benefit of American terror victims, Senator Charles Grassley introduced the Antiterrorism Act of 1990 in April of that year. (*See Id.*) Senator Grassley, proposed the creation of 18 U.S.C. § 2333(a), which in relevant part would provide that "[a]ny national of the United States injured in his person, property, or business by reason of an act of international terrorism may sue therefore in any appropriate district court of the United States...."

(Chesney Decl. at 9 (quoting 136 CONG. REC. S4568–01 (1990))). Alan Kreczko, a State Department official, testified before the Senate Judiciary Committee's Subcommittee on Courts and Administrative Practice that the proposed Antiterrorism bill would "add to the arsenal of legal tools that can be used against those who commit acts of terrorism against U.S. citizens abroad." (*Id.*) Similarly, when Senator Grassley introduced the bill on the floor of the Senate, he explained that it would "strengthen our ability to both deter and punish acts of terrorism.... We must

make it clear that terrorists' assets are not welcome in our country. And if they are found, terrorists will be held accountable where it hurts them most: at their lifeline, their funds." (*Id.* at 12.) Congress passed the Antiterrorism Act of 1990 and the bill was enacted as Pub.L. No. 101–519, § 132(b)(4), 104 Stat. 2250, 2251. (*See Id.*) Due to a procedural error, the Antiterrorism Act of 1990 was repealed in April 1991, and re-introduced and reenacted in the same form, becoming the Antiterrorism Act of 1992. (*See Id.* at 12–13.)

In denying Credit Lyonnais's motion to dismiss the *Strauss* plaintiffs' second and third claims, Judge Sifton recognized, from the legislative history of the Antiterrorism Act and related legislation, the overriding national interest in eliminating financial support of terrorism, finding that "Congress intended these provisions [under Section 2333(a) of the ATA] to impose, 'liability at any point along the causal chain of terrorism.'" *Strauss*, 2006 WL 2862704, at *18 (quoting S.Rep. No. 102–342 at 22). "In enacting the material support statute Congress made an express finding of fact that, 'foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct.'" *Id.* (quoting Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. 104–32, § 301(a)(7), 110 Stat. 1214, 1247 (1996).) Judge Sifton further found that "even the 'provision of basic banking services may qualify as material support'" for liability under 18 U.S.C. § 2339B. *Id.* at *12 (quoting *Linde*, 384 F.Supp.2d at 588).

Similarly, in *Linde*, Judge Gershon denied defendant's motion to dismiss as to a majority of plaintiffs' claims pursuant to 18 U.S.C. § 2333(a), and found that Congress intended to broadly apply the provisions in the Antiterrorism Act. *See* 384 F.Supp.2d at 587. As in this case, the Linde plaintiffs were U.S. citizens injured in terrorist attacks in Israel, allegedly perpetrated by HAMAS. *See Id.* at 575. Pursuant to 18 U.S.C. § 2333(a), plaintiffs sued Arab Bank, a Jordanian finan-

---

**14.** The *Strauss* plaintiffs have "incorporate[d] by reference all the arguments made by them in their submissions of October 18, 2006 and December 18, 2006." (*Strauss* Opp'n at 1.)

cial institution, for knowingly providing financial services for several charities alleged to be HAMAS fronts, in violation of 18 U.S.C. §§ 2339A–C. *See Id.* at 578–579. The court found that "[s]ection 2333 does not limit the imposition of civil liability only to those who directly engage in terrorist acts." *Id.* at 582. The court determined, "None of these provisions [*i.e.*, Sections 2339A–C] ... requires specific intent to commit specific acts of terrorism." *Id.* at 586.

Following the enactment of the ATA, the national concern with global terrorism and its sources of financing persisted. On January 23, 1995, then-President Clinton issued Executive Order No. 12947, Prohibiting Transactions with Terrorists who Threaten to Disrupt the Middle East Peace Process, 60 Fed.Reg. 5,079 (Jan. 23, 1995), pursuant to the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.* President Clinton found that "grave acts of violence committed by foreign terrorists that disrupt the Middle East peace process constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." 60 Fed.Reg. at 5,079. He identified twelve foreign terrorist organizations, including HAMAS, for designation as "Specially Designated Terrorists" and froze the property and interests in property of these organizations in the United States. *Id.* at 5,081.

Executive and Congressional interests in averting terrorist financing continued through the next decade. The national interest in thwarting terrorist financing became paramount when applied to recognized terrorist organizations, particularly in the wake of the September 11, 2001 terrorist attacks. Two weeks after the September 11 terrorist attacks, President Bush issued Executive Order 13224, Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, 66 Fed.Reg. 49,079 (Sept. 23, 2001), pursuant to his powers under the IEEPA, and specifically targeted terrorist financing. Executive Order 13224 increased the array of financial sanctions enforceable against foreign terror-

ist organizations. *See* 66 F.R. 49079. By prohibiting transactions with any organizations designated an SDGT, the President stated,

> We're putting banks and financial institutions around the world on notice, we will work with their governments, ask them to freeze or block terrorist's ability to access funds in foreign accounts. If they fail to help us by sharing information or freezing accounts, the Department of the Treasury now has the authority to freeze their bank's assets and transactions in the United States.[15]

Citing "the pervasiveness and expansiveness of the financial foundation of foreign terrorists," the President prohibited persons and organizations from "assist[ing], sponsor[ing], or provid[ing] financial, material, or technological support for, or financial or other services to or in support of" persons or organizations designated as SDGTs. 66 Fed.Reg. 49,079–49,080. The President annexed a list of SDGTs to his order, and gave the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, the power to designate additional persons and/or entities as SDGTs. *See Id.* at 49,080.

Congress also has expressed its general concern with global terrorist financing, and with the particular role of charities in raising and transferring funds to terrorist organizations. In a 2002 hearing before the Senate Subcommittee on International Trade and Finance, Chairman Evan Bayh stated:

> Cutting off the financing of terrorist organizations is a critically important component of the war against terror and to protect America.... This hearing has been called to send a very clear signal that ... we will do everything humanly possible to stop this illicit financial activity, and that we will expect our allies to do the same.

(Doc. no. 49–2 in 06–cv–702, *Strauss* Pls.' Memo. of Law in Support of its Motion to Compel, dated 10/18/06 ("*Strauss* Pls.' 10/18/06 Motion"), at 16 (quoting Statement

---

**15.** "President Freezes Terrorists' Assets: Remarks by the President, Secretary of the Treasury O'Neill and Secretary of State Powell on Executive Order," White House: Office of the Press

Secretary, Sep. 24, 2001, http://www.whitehouse.gov/news/releases/2001/09/20010924–4.html (last visited Feb. 5, 2008.)

of Chairman Evan Bayh, *The Role of Charities and NGOs in the Financing of Terrorist Activities, Before the U.S. Senate, Committee on Banking, Housing and Urban Affairs, Subcommittee on International Trade and Finance*, Aug. 1, 2003, at 1–2).)

Thereafter, during a 2003 Congressional House hearing, Representative Sue Kelly stated that the President's decision to freeze key assets of HAMAS leaders and certain related international charities "sends a clear message to the world that organizations linked to this heinous group will not be tolerated." (*Strauss* Pls.' 10/18/06 Motion at 6, quoting Statement of Chairwoman Sue W. Kelly, *Hearing on The HAMAS Asset Freeze and Other Government Efforts to Stop Terrorist Funding, Before the U.S. House of Representatives Subcommittee on Oversight and Investigation, Committee on Financial Services*, Sept. 24, 2003, at 1–2.)

The American interest in disrupting terrorist networks with global assistance from American allies is unmistakable. On August 22, 2003, the United States Department of the Treasury designated "five Hamas related charities and six senior Hamas leaders as Specially Designated Global Terrorists, . . . [froze] any assets in the U.S. and prohibit[ed] transactions with U.S. nationals." Significantly, the Department of the Treasury specifically identified CBSP as an SDGT and froze all of its domestic assets, explaining that CBSP is the "primary fundraiser[ ] for HAMAS in France." (*See* "U.S. Designates Five Charities Funding Hamas and Six Senior Hamas Leaders as Terrorist Entities," Dep't of the Treasury News Release, JS–672, dated 8/22/03, http://www.ots.treas.gov/docs/4/48937.html (last visited Feb. 5, 2008); Chesney Decl. at 7–8.) Accordingly, not only does the United States have a demonstrated interest in halting terrorist financing, both domestically and internationally, but the United States also has explicitly found that Credit Lyonnais's client, CBSP, is a "primary" conduit for terrorist funds. (*Id.*) Thus, Credit Lyonnais's noncompliance with plaintiffs' discovery requests "would undermine the important interests of the United States." Rst. § 442(1)(c). Moreover, the United States Treasury Department expressed its intention to seek assistance from France and other allies in stating, "The United States will continue to work with our allies to encourage the recognition of Hamas as a terrorist organization and to shut down their sources of funding and support." (Dep't of the Treasury News Release, JS–672, dated 8/22/03, *supra.*)

Furthermore, the United States has consistently demonstrated its commitment to combating terrorist financing and to enlisting the help of foreign nations. In furtherance of that goal, the United States and other nations, including France, have committed to international cooperation. Both the United States and France are signatories to the United Nations's International Convention for the Suppression of the Financing of Terrorism, which recommends that nations "adopt[ ] effective measures for the prevention of the financing of terrorism. . . ."[16] Both countries are also members of the Financial Action Task Force ("FATF"), which likewise seeks international cooperation in combating terrorist financing.[17]

Thus the court finds that granting Credit Lyonnais a protective order would undermine the irrefutably vital interest of the United States in ensuring that plaintiffs who are victims of terrorist attacks receive the discovery they seek in prosecuting their civil claims.

**(b)** *The French Interest.*

Pursuant to Rst. § 442, in considering the comity factor, the court should also weigh "the extent to which . . . compliance with the [discovery] request would undermine the important interests of the state where the information is located." Where "there is a true conflict between American law and that of a foreign jurisdiction," New York conflict of

---

**16.** International Convention for the Suppression of the Financing of Terrorism, G.A. Res. 109, U.N. GAOR, 54th Sess., Supp. No. 49, at 408, U.N. Doc. A/54/49 (Vol. I) (1999), *entered into force* April 10, 2002; http://www.un.org/law/cod/finterr.htm (last visited Feb. 5, 2008).

**17.** Financial Action Task Force on Money Laundering, The Forty Recommendations, June 20, 2003 (incorporating the amendments of Oct. 22, 2004), http://www.fatfgafi.org/dataoecd/7/40/34849567.PDF (last visited Feb. 5, 2008).

law rules require the court to conduct a comity analysis. *In re Maxwell Comm. Corp. v. Societe Generale,* 93 F.3d 1036, 1050 (2d Cir.1996) (citing *Hartford Fire Ins. Co. v. California,* 509 U.S. 764, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993)). The Supreme Court long ago explained,

> "Comity," in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.

*Hilton v. Guyot,* 159 U.S. 113, 143, 16 S.Ct. 139, 40 L.Ed. 95 (1895).

Here, there is a "true conflict of laws" because adhering to the plaintiffs' discovery requests or any court order compelling such discovery would apparently violate French civil and criminal laws. First, according to Cutajar's declarations,[18] Article L 511–33 of the Monetary and Financial Code provides that the bank "is bound by professional secrecy," which may only be waived by a "person affected by information of a confidential nature...." (Cutajar Decl. at ¶¶ 10, 12; Suppl. Cutajar Decl. at ¶ 16.) Violation of bank customer secrecy is punishable by criminal penalties (Article 226–13 of the Criminal Code imposes one year of imprisonment and Q 5,000), disciplinary penalties (Article L 613–21 of the Monetary and Financial Code imposes, *inter alia,* sanctions, reprimands and/or forced resignation), and civil penalties imposing contractual and tort liability. (Cutajar Decl. at ¶¶ 14–23.) Second, as provided by Articles 1 and 1 bis of French Law No. 68–678 (the so-called "French blocking statute"), Credit Lyonnais is also subject to laws prohibiting the disclosure to foreign public authorities of "documents or information of an economic, commercial, industrial, financial

or technical nature, the disclosure of which would affect the sovereignty, security or essential economic interests of France ...," violation of which is punishable by six months imprisonment and a fine of Q 18,000 (pursuant to Article 3 of the Criminal Code.) (Cutajar Decl. at ¶¶ 24–26; Suppl. Cutajar Decl. at ¶ 17.) Third, Credit Lyonnais "is subject to laws prohibiting the disclosure of information covered by judicial secrecy," as provided by Articles 11 and 434–7–2 of the Code of Criminal Procedure, violation of which is punishable by two years imprisonment and a fine of Q 30,000 (pursuant to Article 434–7–2 of the Criminal Code), or two years imprisonment and a fine of Q 4,500 (pursuant to Article 58 of the Criminal Code). (Cutajar Decl. at ¶¶ 35–37; Suppl. Cutajar Decl. at ¶¶ 18–19.) Lastly, Credit Lyonnais is "subject to professional confidentiality obligations arising under French anti-money laundering and antiterrorism laws," codified at Articles L 561–1 to L 563–5 of the Monetary and Financial Code. Penalties for disclosing such information to a third party is punishable by a fine of Q 22,500 (pursuant to Article L 574–1 of the Monetary and Financial Code) or one year of imprisonment and a fine of Q 15,000 (pursuant to Article 226–13 of the Criminal Code). (*See* Cutajar Decl. at ¶¶ 29–34.)

Accordingly, the court will consider the rights and interests of France with respect to the foregoing civil, criminal and disciplinary measures in relation to the facts presented by the instant motions.

Comment (c) to Rst. § 442 provides guidance for this analysis:

> In making the necessary determination of foreign interests under Subsection (1)(c), a court or agency in the United States should take into account[,] ... expressions of interest by the foreign state, as contrasted with expressions by the parties; ... the significance of disclosure in the

---

18. Pursuant to Rule 44.1 of the Federal Rules of Civil Procedure, "The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law." "Among other sources, the Court may consider

the opinions of experts, but it is not bound by their testimony, even if uncontradicted." *British Int'l Ins.,* 2000 WL 713057, at *7 (further citations omitted). Therefore, the court will consider the French Ministry Letter, as well as expert opinions submitted by both parties, including those incorporated by reference from prior submissions, and the French laws cited therein.

448

regulation by the foreign state of the activity in question; ... indications of the foreign state's concern for confidentiality prior to the controversy in connection with which the information is sought ... [and] the long-term interests of the United States generally in international cooperation in law enforcement and judicial assistance, in joint approach to problems of common concern, in giving effect to formal or informal international agreements, and in orderly international relations.

Comment (e) to the same section states that, because Section 442 applies to pretrial procedures, "somewhat less deference to the law of the other state may be called for."

The court first considers the expressions of interest by the foreign state and the foreign state's concern for confidentiality prior to the controversy in connection with which the information is sought. Since this court's May 25, 2007 order addressing virtually the same issues presented in the instant motions, the French government finally has responded to Credit Lyonnais's repeated requests for guidance regarding its discovery obligations in this case. (*See* French Ministry Letter.) The French government's expression of its interest to Credit Lyonnais, through their Ministry of Justice letter, "confirmed" the position of the Republic of France that use of the Hague Convention is, in its view, "the exclusive and mandatory" means by which "to obtain evidence in another State that is also bound by that instrument." (*Id.* at 1.) "Thus," according to the French government, "any search for evidence in the territory of France by foreign authorities that would be conducted outside a duly formalized request for judicial mutual aid would clearly constitute a violation of the sovereignty of the French State." (*Id.*) The French Ministry Letter also cites the French Blocking Statute ("Article 1 of the law of July 26, 1968"), stating that "French criminal law prevents the search and disclosure by any person of economic, commercial, industrial, financial or technical documents or information that are to constitute evidence for foreign judicial or administrative proceedings." (*Id.* at 2 n. 1.)

The French Ministry Letter, does not, as Credit Lyonnais suggests, however, "change dramatically" the circumstances of the court's previous analysis in *Strauss.* The

French government has done little more than generally state its interest in sovereignty and restate that which was previously considered by this court when it decided the *Strauss* plaintiffs' prior motion to compel, namely that French civil and criminal laws prohibit Credit Lyonnais from disclosing at least some of the information in dispute here. (Def.'s Memo. at 2, 10–13.)

With the utmost respect for the Republic of France, this court has gone to great lengths to analyze and balance the various interests at stake, including those of the United States, France, and the litigants, yet the French Ministry's letter has added little to the analysis that justifies altering in any significant way the court's prior balancing of the national interests. The court respectfully disagrees with defendant's assertion that France's "interests in combating terrorism *and* in protecting its sovereign can *both* be served by requiring plaintiffs to comply with the Hague Convention (Def.'s Reply at 3) (emphasis in original), because vital, relevant and narrowly tailored discovery would not be obtainable through the Hague Convention." France remains inexplicably silent regarding its national interest in combating terrorist financing, and fails to state how that interest factors into a balancing analysis with France's purported interest in its blocking statute, and its generally-stated sovereignty. Although Credit Lyonnais urges the court to interpret France's silence on these issues as implicitly confirming the French position "that its interest in combating terrorism can be fully vindicated if plaintiffs were to comply with the Hague Convention when seeking discovery from [Credit Lyonnais]," the court will not read the French Ministry Letter in so nuanced a manner. (Def.'s Memo. at 12.) Rather than infer overarching principles from what the French Ministry Letter does not state, the court considers the French Ministry's letter for what it is: a general statement regarding France's sovereign interest, a statement that France considers the Hague Convention to be exclusive and mandatory, and a reminder of the existence of the French blocking statute, which, as the letter indicates, has recently been used to prosecute an individual seeking discovery in

France, albeit in circumstances inapposite to those presented here.

Also important, although not singularly dispositive, is the fact that the French Ministry Letter mentions only its blocking statute but does not mention France's interest in its bank secrecy laws or how its interest in its bank secrecy laws, if any, might be weighed against France's interest in thwarting terrorist financing. *See Minpeco*, 116 F.R.D. at 525 (denying plaintiff's motion to compel where "the Swiss government has submitted to the court two official statements in this case which express its general position as to the importance of Swiss banking secrecy laws to the interests of Switzerland....") France may very well have a genuine national interest in protecting the privacy of its French bank customer. Yet, CBSP, whose accounts were closed by Credit Lyonnais in 2002 and 2003, and whose records have been produced to the *Strauss* · plaintiffs pursuant to this court's May 25, 2007 order, has still not demonstrated, much less stated, any interest in preserving the confidentiality of the records of its now inactive bank accounts. As of the date of this order, there is no indication in the record that CBSP has responded substantively to the bank's repeated attempts at contact. Defendant's cryptic and minimal reference to a letter by CBSP's attorney to a French bar official, and to defendant's French counsel, adds nothing to the court's analysis. (See Def.'s Memo. at 7.) The court should reasonably expect that if CBSP objected to the production by Credit Lyonnais of information regarding CBSP's accounts, it would have so stated. Although CBSP's disinterest in protecting its rights to bank secrecy may not constitute a waiver of that right, CBSP's lack of response demonstrates a lack of vigilance and interest in preserving its right to financial secrecy.

The court next considers the "the significance of disclosure in the regulation by the foreign state of the activity in question." Comment (c) to Rst. § 442. France's interest—albeit not directly expressed to this court in this proceeding—in enhancing its anti-money laundering and anti-terrorist financing laws is consistent with the disclosures sought by plaintiffs and already made,

in part, by Credit Lyonnais. In deciding defendant's motion to dismiss, Judge Sifton noted that the French government commenced an investigation of CBSP in 2001, and that the French press reported in 2003 that the public prosecutor's office in Paris referred concerns about CBSP to France's Counter Terrorist National Division. *See Strauss*, 2006 WL 2862704, at *5.

Moreover, the French Ministry's letter does not state that Credit Lyonnais will be prosecuted if it complies with this court's order to provide discovery. Rather, it states generally without specific reference to Credit Lyonnais that "any person" who engages in searches or disclosures prohibited by the French blocking statute is "subject to criminal penalties ..." and provides an example of the "particularly broad" scope of the law. (French Ministry Letter at 2.) Although Credit Lyonnais is obligated not to disclose any suspicious activity reports it sends to a French government agency known as TRACFIN (Traitement du renseignement et action contre les circuits financiers clandestins, or "agency for intelligence gathering and action against clandestine financial networks"), this court has previously noted that Credit Lyonnais has already publicly disclosed the existence of the CBSP accounts, a report by Credit Lyonnais to TRACFIN concerning CBSP, and actions by Credit Lyonnais to close the CBSP accounts. Indeed, on January 6, 2006, Credit Lyonnais issued a press release, apparently without civil or criminal sanctions, stating:

> In late 2000, in view of unusual activity occurring in [CBSP's] main account, Credit Lyonnais reported such activity as required by law. In January 2002, in keeping with the bank's own internal regulations, Credit Lyonnais began a process of closing these accounts, which was finalized in September 2003.[19]

Returning to the specific statutes invoked by Credit Lyonnais, and bearing in mind that the Supreme Court has generally noted that "it is well settled that such statutes do not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of

---

**19.** Credit Lyonnais's Jan. 6, 2006 Press Release, attached as Ex. A to the *Strauss* 3d. Am. Compl.

production may violate the [foreign] statute," *Aerospatiale*, 482 U.S. at 544 n. 29, 107 S.Ct. 2542, the court will now examine each statute in turn.

Credit Lyonnais now contends for the first time that this court erred by relying on prior comity decisions from courts in the Second Circuit stating that French bank secrecy law, codified at Article L 511–33 of the Monetary and Financial Code, "is not intended to apply to litigation in which the bank is a party." *Bodner*, 202 F.R.D. at 376 (citing *Alfadda*, 1993 WL 33445, at *3). According to Cutajar, who neglected earlier to argue that American courts have erroneously applied French law, "for the bank to be released from its duty of professional secrecy when it is a party to the litigation, it is essential that its client ... be a plaintiff in the proceedings." (Cutajar Suppl. Decl. at 1–3.) [20] Under Cutajar's reading of the bank secrecy laws, it follows that, because CBSP is not a plaintiff in these cases, Credit Lyonnais is subject to potential liability for disclosing information pertaining to CBSP. Nevertheless, for several reasons, the court is not persuaded that this new argument warrants a different result. First, as noted, CBSP has not asserted its alleged rights to secrecy in this matter despite Credit Lyonnais's attempts to secure their permission. If CBSP were so concerned with its privacy rights, it would surely have come forward to be heard. Second, as discussed above, Credit Lyonnais, without sanction by the French government, has affirmatively issued press releases disclosing information similar to that sought by plaintiffs here, information that would seemingly violate CBSP's rights under the French bank secrecy laws. Third, nothing among defendant's voluminous submissions states the probability or likelihood that Credit Lyonnais might actually be prosecuted for violating the French secrecy laws. Fourth, after the French Ministry of Justice issued its letter, Credit Lyonnais properly complied with this court's order compelling discovery and has not been prosecuted. Finally, the French Ministry Letter says nothing about French secrecy laws and how they might apply to the facts of this case. Therefore,

the court does not view the French Ministry Letter as sufficient to justify issuing protective orders in these cases.

With respect to the French blocking statute, French Law No. 68–678, and Criminal Code 410–1, which imposes penalties on those who violate the French blocking statute, the Supreme Court noted, "It is clear that American courts are not required to adhere blindly to the directives of such a statute. Indeed, the language of the statute, if taken literally, would appear to represent an extraordinary exercise of legislative jurisdiction by the Republic of France over a United States district judge," and thus the French blocking statute is not a basis for denying discovery. *Aerospatiale*, 482 U.S. at 544 n. 29, 107 S.Ct. 2542; *Minpeco*, 116 F.R.D. at 528 (denying motion to compel but noting that "this is not a situation in which the party resisting discovery has relied on a sham law such as a blocking statute to refuse disclosure"); *Bodner*, 202 F.R.D. at 374 (compelling discovery despite French banks', including Credit Lyonnais, objections that disclosure would violate the blocking statute); *Adidas Ltd. v. SS Seatrain Bennington*, Nos. 80 Civ.1911 & 82 Civ. 0375, 1984 WL 423, at *3 (S.D.N.Y. May 30, 1984) (declining to apply the French blocking statute).

Credit Lyonnais's reliance on the Paris Court of Appeals and Supreme Court decisions, *In re Christopher A.*, does not change this court's opinion. First, notwithstanding defendant's criticism of plaintiffs for distinguishing the French decision "under common law reasoning," the court disagrees that French civil law should control American courts. *In re Christopher A.* presents significantly different facts than those presented here. In that case, a French attorney, "Christopher A.," was accused of violating the French blocking statute (articles 3, 1– BIS of Law No. 68–678) by attempting to ascertain in a telephone conversation with "Mr. Jean–Claude L.", a former director of a non-party, Mutuelle d'assurance articsanale de France ("MAAF"), whether he could "designate Mr. L. as a possible witness for

---

**20.** The French cases cited and quoted by Cutajar do not explicitly state that the bank may be released from its bank secrecy obligations only if

its client is a plaintiff bringing claims against the bank.

the prosecution ... in connection with ... proceedings pending since 1999 before a California court concerning ... MAAF's participation in the takeover of the company Executive Life," without employing the procedures available under the Hague Convention. (Appellate decision *In re Christopher A.* at 2.) Unlike the facts here, it appears that Christopher A. was not conducting discovery against a party within the confines of the Federal Rules of Civil Procedure or pursuant to any court order, and, although Cutajar opines that "CREDIT LYONNAIS would not be exempted from its criminal liability by invoking an obligation imposed on it by an American judge to disclose information that was covered by bank secrecy," she cites to no discernable authority for that proposition. (Cutajar Decl. at ¶ 16.) Moreover, the Paris Court of Appeals found that Christopher A. had "made false statements in order to discover the truth," a fact that plainly distinguishes that case from this one. (*In re Christopher A.* at 4.) Finally, according to plaintiffs, "MAAF filed a complaint with the French authorities" to initiate the prosecution. (*Strauss* Opp'n at 9.) It remains unlikely that if CBSP were to file a complaint, given its status as a Specially Designated Global Terrorist organization and Credit Lyonnais's decision to close its bank accounts for similar reasons, CBSP would succeed at convincing the French government to commence a prosecution against Credit Lyonnais. Thus, the court maintains the view that Credit Lyonnais has not presented evidence that it faces a specific or significant risk of prosecution for violations of the French blocking statute if it complies with its discovery obligations pursuant to court order.

Third, the prohibition against disclosing "information covered by judicial secrecy," as provided in Articles 11 and 434-7-2 of the Code of Criminal Procedure, is not at issue in this case. As this court previously discussed in *Strauss,* Article L 434-7-2 only imposes sanctions if disclosures are made to persons "likely to be involved as perpetrators, co-perpetrators, accomplices or receivers in the commission of these infractions ... for the purpose of interfering with the progress of the investigations or the search for the truth...." (Cutajar Decl. ¶ 37; French

Criminal Code Article 434-7-2, attached as Ex. 26 to the Cutajar Decl.; Cutajar Suppl. Decl. ¶ 19.) Plaintiffs here are neither "perpetrators, accomplices or receivers" of any crime, nor would disclosure be made for the purpose of interfering "with the progress of the investigations or the search for the truth." (*Id.*) In the context of this civil action, the search for the truth warrants the bank's responses to plaintiffs' discovery demands. Other than its own press release, Credit Lyonnais has not disclosed the existence of any criminal proceeding or investigation to any likely perpetrators, co-perpetrators or accomplices, and this court would not require such disclosure. *See Abdell v. City of New York,* No. 05 Civ. 8453, 2006 WL 2664313, at *5 (S.D.N.Y. Sept. 14, 2006) (noting the "peril [of permitting discovery] is exacerbated where the ongoing case is criminal, since the information disclosed could end up in the hands of the criminal defense attorneys and jeopardize the prosecution"); *Sec. and Exch. Comm'n v. Downe,* No. 92 Civ 4092, 1993 WL 22126, at *13 (S.D.N.Y. Jan.26, 1993) ("Courts have granted stays of discovery in order to protect the integrity of the pending criminal investigations, even where an indictment has not yet been returned.")

As commentary to Restatement § 442(c) suggests, the court should consider "the long-term interests of the United States generally in international cooperation in law enforcement and judicial assistance, in joint approach to problems of common concern, in giving effect to formal or informal international agreements, and in orderly international relations." Although the French Justice Ministry's letter states France's interest in employing the Hague Convention, and France's blocking statute and principles of sovereignty, France, like the United States, has elsewhere expressed and demonstrated a profound and compelling interest in eliminating terrorist financing. That France has an interest in eradicating the financing of terrorism by imposing monitoring and reporting obligations on its banks regarding customers who finance, or may be suspected of financing, terrorist acts around the world, is established by the fact that France has signed international treaties that mandate such

monitoring and disclosure and explicitly direct the member countries to cooperate in legal proceedings against suspected terrorist financing groups. Along with the United States, France is a signatory to the United Nation International Convention for the Suppression of the Financing of Terrorism. Article 12 of the Convention provides,

> 1. States Parties shall afford one another the greatest measure of assistance in connection with criminal investigations or criminal or extradition proceedings in respect of the offenses set forth in article 2, including assistance in obtaining evidence in their possession necessary for the proceedings.
>
> 2. States Parties may not refuse a request for mutual legal assistance on the ground of bank secrecy.[21]

Although Article 12 prescribes assistance and cooperation among signatory nations in connection with criminal investigations and extradition proceedings, plaintiffs' actions seeking compensation for victims of international terrorist attacks and discovery from a bank alleged to be providing material support to terrorists, is not inconsistent with the French and American interests in international cooperation to detect and fight global terror and the financing of global terror.

France is also a participant in the multinational Financial Action Task Force, which "calls upon all countries to take the necessary steps to bring their national systems for combating ... terrorist financing into compliance with the new FATF Recommendations."[22] Judge Sifton has determined that all banks, including Credit Lyonnais, having international operations or relationships with correspondent banks have a duty to adopt know-your-customer, anti-money laundering, and anti-terrorist financing standards as defined and enforced by the FATF. *See Weiss,* 453 F.Supp.2d at 619. Recommendation 36 states, "Countries should rapidly, constructively and effectively provide the widest possible range of mutual legal assistance in relation to ... terrorist financing investigations, prosecutions and related proceedings."[23]

Following its obligations as an FATF participant, according to defendant's expert, France "created a legislative arsenal intended to combat money laundering and the financing of terrorism in compliance with the recommendation of the FATF." (Cutajar Decl. at ¶ 29.) The French Monetary and Financial Code, Articles L. 561–1 to L. 563–3 and Articles R 562–1 to R 564–4, "imposes on banks, in particular, compliance with the obligations of vigilance, the purpose of which is to ensure knowledge of the client and of the operations that he or she is carrying out ('Know Your Customer')." (*Id.* at ¶ 30.) If the bank "has a suspicion ... [or] believes that the funds or the requested operation involves funds that might come, in particular, from the financing of terrorism, the bank[ ] must make a statement to the Financial Intelligence Cell, TRACFIN." (*Id.*) Once TRACFIN determines that the operation "likely ... constitute[s] an infraction of money laundering or the financing of terrorism, TRACFIN will immediately refer it to the district attorney of the Republic who will then diligently proceed with an inquiry.... CREDIT LYONNAIS is also subject to obligations of secrecy relating to any such judicial inquiry." (*Id.* at ¶ 34.) The efforts of Credit Lyonnais to know its customer, CBSP, strikes at the heart of plaintiffs' claims.

On December 27, 2001, the European Union adopted Council Regulation (EC) No. 2580/2001, which states that:

> 1. (a) all funds, other financial assets and economic resources belonging to, or owned or held by, a natural or legal person, group or entity included in the list [of designated terrorists] shall be frozen;
>
> (b) no funds, other financial assets and economic resources shall be made available, directly or indirectly, to, or for the benefit of, a natural or legal person, group or entity included in the list....
>
> 2. .... [I]t shall be prohibited to provide financial services to, or for the benefit

---

**21.** *Supra,* Int'l Conv. for the Suppression of the Financing of Terrorism at Article 12.

**22.** *Supra,* Financial Action Task Force on Money Laundering, The Forty Recommendations.

**23.** *Id.*

of, a natural or legal person, group or entity included in the list.... [24]

On September 14, 2003, the EU amended the list of designated terrorist organizations to include HAMAS.[25]

France, therefore, "following the example of the United States and the European Union," and pursuant to its obligations as an FATF participant, requires its banks to monitor any assets potentially available to HAMAS. (Cutajar Decl. at ¶ 29.) As indicated by comment (c) to Rst. § 442, France has therefore "express[ed] interest" in the issues in this action and the related discovery, and also underscored its national interest in cooperating with the United States and other countries in fighting global terrorist financing through international agreements. Notwithstanding the French concern for confidentiality with respect to its bank customers and its stated "sovereign" interest, (French Ministry Letter at 1), this court's denial of defendant's motions for protective orders would also enhance the French interest in fighting global terrorist financing and "give effect to formal ... international agreements" to which France is a party. Rst. § 442, comment (c).

The French interest in fighting global terrorism is even more relevant here, where Credit Lyonnais has previously acted upon its suspicion that CBSP warranted investigation of its ties to money laundering and terrorism. As cited above, Credit Lyonnais issued a press release announcing that it had closed CBSP's accounts in September 2003, and stated:

In 1990, accounts in the name of the "Comite de Bienfaisance pour la Solidarite avec la Palestine" [Committee for Palestinian Charity and Aid or CBSP] were opened in France in strict observance of applicable regulations. The association in question was designated non-profit, in accordance with French law 1901.... It should be

pointed out that the association in question, which still does not appear on any European lists of enterprises linked to terrorism, was not mentioned on American lists until August 2003.[26]

As Judge Sifton noted, the Israeli press reported that the Government of Israel, in 1997, declared CBSP an "unlawful organization" due to its affiliation with, and support of, HAMAS and HAMAS front organizations. *Strauss*, 2006 WL 2862704, at *5. Judge Sifton determined that "it is reasonable to believe" that when Credit Lyonnais noticed "unusual activity" on CBSP's accounts in 2000, in the form of large transfers of money to the West Bank and Gaza Strip during the highly publicized Intifada, the bank would have investigated the organizations receiving the transfers, "including designations of terrorist organizations made by the government who was experiencing terrorism." *Id.* at *14. Despite the assertion by Credit Lyonnais that its suspicion of money laundering was the basis of its referral of the matter to TRACFIN, an agency responsible both for fighting money laundering and terrorist financing, plaintiffs should not be deprived of discovering information related to CBSP's financial transactions through its account at Credit Lyonnais, and the bank's knowledge regarding CBSP's association with the donors to and recipients of funds from CBSP's accounts. As Judge Sifton stated, "[M]oney laundering and terrorism are often linked as evidenced by the fact that Tracfin is responsible for fighting both." *Id.*

Accordingly, denying defendant's motions for protective orders and ordering Credit Lyonnais to provide plaintiffs with discovery would not "undermine the important interests of the state where the information is located," but rather, enforce them. Rst. § 442; *cf. Minpeco*, 116 F.R.D. at 523 (denying discovery where foreign state objected); *Societe Internationale*, 357 U.S. at 200–

**24.** European Union, Council Regulation (EC) No. 2580/2001/EC of 27 Dec. 2001, http://eur-lex.europa.eu/smartapi/cgi/sga—doc?smartapi!celexapi!prod!CELEXnumdoc & lg=EN & numdoc=32001R2580 & model=guichett (last visited Feb. 5, 2008).

**25.** European Union, Council Decision 2003/646/EC of 14 Sept. 2003, http://europa.eu.int/smartapi/cgi/sga_doc?smartapi! celexa-

pi!prod!CELEXnumdoc & lg=EN & numdoc=32003D0902 & model=guichett (last visited Feb. 5, 2008). For an updated list, see European Union, Council Decision 2006/379/EC of 29 May 2006, http://eur-lex.europa.eu/LexUriServ/site/en/oj/2006/L_144/L_14420060531en00210023.pdf (last visited Feb. 5, 2008.)

**26.** *See supra*, Credit Lyonnais's Jan. 6, 2006 Press Release.

201, 78 S.Ct. 1087 (denying discovery where foreign state confiscated the documents).

### 6. *Credit Lyonnais Will Not Likely Face Substantial Hardship by Complying with Plaintiffs' Requests.*

In addition to the five factors prescribed in the Restatement, under the analysis suggested in *Minpeco*, courts may also consider the hardship a foreign party might suffer if compelled to respond to a discovery order issued by a federal court in the United States. *See Minpeco*, 116 F.R.D. at 522–523; *In re Grand Jury Subpoena*, 218 F.Supp.2d at 554.

"In examining the hardship on the party from whom compliance is sought, courts . . . look at the likelihood that enforcement of the foreign law will be successful." *Minpeco*, 116 F.R.D. at 526. "Although neither side ha[d] provided helpful information regarding frequency of enforcement and punishments imposed under [the Swiss penal law]," the *Minpeco* court denied plaintiffs' motion to compel, in part because the successful defense of the Swiss bank, from which discovery was sought, was "highly speculative" because the statutory defenses available to it were inapplicable. *See Id.*

By contrast, in *United States v. First Nat'l City Bank*, the court examined the likelihood that the German bank would suffer significant civil penalties, but found both that the chance was "slight and speculative" and that the bank had "a number of valid defenses." 396 F.2d 897, 905 (2d Cir.1968). The court also noted that the German government had not "expressed any view on this case or indicated that, under the circumstances presented here, enforcement of the subpoena would violate German public policy or embarrass German–American relations." *Id.* at 904.

The prospect that the foreign litigant would face criminal penalties rather than civil liabilities weighs in favor of the objecting party. *See Id.* at 901 (according the possibility of civil sanctions less weight than the possibility of criminal prosecution); *Minpeco*, 116 F.R.D. at 524 ("[C]ourts in this circuit have considered the foreign nation's interest in prohibiting disclosure weaker . . . where the consequence of disclosure is at most civil liability."). If, however, the objecting litigant is a party to the action, courts accord that

party's hardship less weight. *See Id.* at 526–527 (declining to order discovery in part because the objecting party was "no longer a primary defendant . . . and stands, instead, as to the plaintiffs, in the posture of a nonparty witness"). The *Minpeco* court also found that because the bank was not a party to the litigation, the hardship likely to be imposed upon it "weigh[ed] more heavily in the balance." *Id.; see also Alfadda*, 149 F.R.D. at 38–39 ("[A]ny potential hardship faced by a primary defendant in litigation may be weighed less heavily by the court.").

Moreover, despite Credit Lyonnais's argument that American courts have construed French law erroneously, courts have already considered and found unpersuasive the potential imposition of the same penalties Credit Lyonnais cites here. The Supreme Court examined Articles 1–3 of French Penal Code Law No. 80–538, the French blocking statute, and ordered discovery notwithstanding the penalties that could be imposed, stating, "It is clear that American courts are not required to adhere blindly to the directives of such a statute." *Aerospatiale*, 482 U.S. at 544, 107 S.Ct. 2542. In *Bodner*, the court examined the French blocking statute and French bank secrecy law (Article 226–13 of the French Criminal Code), both of which Credit Lyonnais seeks to apply here. 202 F.R.D. at 373 n. 2. The court held that "those laws would not prevent the plaintiffs from receiving information sought on this motion. . . ." *Id.* at 376. Likewise, in *Compagnie Francaise*, the court also examined the blocking statute and held, "There is little evidence that the statute has been or will be enforced. . . . Even if criminal penalties were likely to be imposed, however, it would not necessarily be sufficient to warrant nondisclosure in this case." *Compagnie Francaise*, 105 F.R.D. at 30 (citing *United States v. First Nat'l Bank of Chicago*, 699 F.2d 341, 345 (7th Cir.1983) and *In re Grand Jury Proceedings*, 532 F.2d 404, 407 (5th Cir. 1976)). The Seventh Circuit held,

> The fact that foreign law may subject a person to criminal sanctions in the foreign country if he produces certain information does not automatically bar a domestic court from compelling production. . . . Rather what is required is a sensitive balancing of the competing interests at stake.

*First Nat'l Bank of Chicago,* 699 F.2d at 345 (citations omitted); *see also Bodner,* 202 F.R.D. at 375 ("As held by numerous courts, the French Blocking Statute does not subject defendants to a realistic risk of prosecution, and cannot be construed as a law intended to universally govern the conduct of litigation within the jurisdiction of a United States court.").

Although Credit Lyonnais has demonstrated that the French bank secrecy laws have been enforced (*see* Cutajar Decl. at ¶¶ 11–13, 17–18, 35), and that the French government at least occasionally prosecutes violations of its blocking statutes, albeit under circumstances different from the instant action (*see* French Ministry Letter), the bank has failed to demonstrate that either CBSP or the French government would likely seek to prosecute or otherwise sanction Credit Lyonnais for complying with a United States court order compelling disclosure of documents and information regarding CBSP's accounts. Civil liability is also speculative, given that CBSP has shown no interest in protecting, much less asserting, its privacy right, as established by its lack of response to Credit Lyonnais's two letters. Unlike in *Minpeco,* Credit Lyonnais both is a party to the litigation, and, as in *First Nat'l City Bank,* the French government has failed to submit any direct objections to producing the requested information, not even in response to three inquiries by Credit Lyonnais. *See Minpeco,* 116 F.R.D. at 526; *First Nat'l City Bank,* 396 F.2d at 904; *In re Grand Jury Subpoena,* 218 F.Supp.2d at 549 (ordering production despite submissions by the foreign state's Ministry of Justice stating that the requested discovery was "strictly confidential" and would violate the state's civil and criminal statutes). Despite Credit Lyonnais's assertions that the "there now can be no question but that [Credit Lyonnais] will face substantial hardship if it complies with plaintiffs' non-Hague Convention requests" (Def.'s Memo. at 15), the court is not convinced that is the case. Judge Sifton has noted, for example, that the FATF, of which France is a member, has warned financial institutions that they could be exposed "to significant reputational, operational and legal risk" if they engage in business relationships with "high risk" customers such as charities collecting funds related to terrorist activities. *Weiss,* 453 F.Supp.2d at 619. Moreover, considering that Credit Lyonnais has not faced any articulated harm following its previous disclosure of protected information in a press release, or following its *Strauss* production, Credit Lyonnais fails to explain why it continues to believe that such hardship is either imminent or inevitable.

Further lessening Credit Lyonnais's potential hardship is the fact that the parties are bound by protective orders entered on March 10, 2006 in *Strauss* (doc. no. 7) and July 18, 2007 in Wolf (doc. no. 27) that forbid them from publicly disclosing any sensitive information produced to them by Credit Lyonnais. *See Ssangyong v. Vida Shoes Int'l, Inc.,* No. 03 Civ. 5014, 2004 WL 1125659, at * 13 (S.D.N.Y. May 20, 2004) (finding that the possibility of hardship "will be greatly lessened if [the court] make[s] a strict confidentiality order"); *Trade Dev. Bank,* 469 F.2d at 41 n. 3; *Bodner,* 202 F.R.D. at 376 (finding that "the use of an appropriate protective order" lessened defendant's potential hardship).

Credit Lyonnais has not demonstrated any likelihood that it will be pursued civilly or criminally if its motions for protective orders are denied and if it continues to respond to plaintiffs' discovery requests, particularly where the French interest in preventing terrorist financing through monitoring and reporting is so clearly demonstrated, and CBSP has not indicated that it objects to the bank responding to plaintiffs' discovery. Thus, "the goals of the plaintiffs in this case clearly are consistent with the objectives of the French Government, as evidenced by that government's laudable efforts" in participating in both the U.N. Convention and the FATF, as well as implementing domestic laws incorporating international recommendations to combat terrorist financing. *Bodner,* 202 F.R.D. at 376–377.

### 7. *Credit Lyonnais Has Acted in Good Faith.*

The last factor courts in this Circuit may consider in determining whether to order production is "the good faith shown by the party resisting discovery." *Minpeco,* 116 F.R.D. at 528; *see also Reino De Espana,*

2005 WL 1813017, at \*8. "Generally, courts only consider the good faith of a party resisting discovery in deciding whether to impose sanctions after a production order is violated.... The Second Circuit, however, has also considered good faith at the order stage." *Compagnie Francaise*, 105 F.R.D. at 31 (citing *Trade Dev. Bank*, 469 F.2d at 40–41). Bad faith delays and dilatory tactics will weigh against the objecting party. *Societe Int'l*, 357 U.S. at 208, 78 S.Ct. 1087. In this case, Credit Lyonnais has made at least two efforts to contact CBSP for its consent for Credit Lyonnais to respond to plaintiffs' discovery requests, and at least three efforts to contact the French Ministry of Justice for guidance. *See Strauss*, 242 F.R.D. at 226. Thus, the defendant has apparently made "good faith[,] diligent efforts" to secure discovery. *Reino De Espana*, 2005 WL 1813017, at \*8.

However, "notwithstanding [a litigant's] good faith, [the court is] not precluded from issuing a production order." *Id.* at \*8 (citing *Compagnie Francaise*, 105 F.R.D. at 32). The court notes that the bank's second attempts to contact CBSP and the French Ministry (letters dated September 14 and 29, 2006), were made following court orders to do so (see *Strauss* orders dated September 11 and 20, 2006). *Strauss*, 242 F.R.D. at 226. Therefore, "[w]hile evincing a measure of good faith, the Court is not convinced that [defendant's] efforts [are] sufficient to tilt the balance in its favor," and against disclosure. *Reino De Espana*, 2005 WL 1813017, at \*8.

### CONCLUSION

All factors enumerated in Restatement § 442(1)(c), *Aerospatiale* and *Minpeco*, with the possible exception of the foreign origination of the sought discovery and Credit Lyonnais's good faith, weigh in favor of plaintiffs. Most importantly, the mutual interests of the United States and France in thwarting terrorist financing outweighs the French interest in preserving bank customer secrecy, and its generally-stated sovereign interest. The production of documents previously has been ordered by a court that has jurisdiction over the defendant, a company that operates within the United States. France has otherwise demonstrated its national interest in cooperating in international efforts to detect, monitor and report customer links to terrorist organizations, and freeze funds used for terrorist financing and has not expressly addressed its competing interests should be balanced.

Moreover, Credit Lyonnais has investigated CBSP's connections to terrorism and/or money laundering, reported CBSP's activities to TRACFIN and, presumably detecting a connection with terrorism and/or money laundering, closed CBSP's accounts. In addition, although the requested discovery originated outside of the United States, and may not be accessible within the United States, it is crucial to this litigation and is specifically tailored to the issues in this case. Plaintiffs do not have viable alternative means of securing the discovery because only Credit Lyonnais or CBSP have access to the requested records. Obtaining the discovery through the Hague Convention can be costly, uncertain, time-consuming, and, with respect to information protected by French bank secrecy laws, would not yield full and adequate production of the requested documents, as Credit Lyonnais acknowledges. Moreover, although Credit Lyonnais has made good faith efforts to provide the requested discovery, Credit Lyonnais has not demonstrated that it is likely to face substantial hardship by complying with plaintiffs' discovery requests. Therefore, defendant's motions for protective orders are hereby denied.

Accordingly, by *March 24, 2008*, Credit Lyonnais shall produce all documents responsive to plaintiffs' Document Requests and respond to plaintiffs' Requests for Admissions and Interrogatories discussed herein, as well as designate one or more corporate representatives to testify pursuant to the *Strauss* plaintiffs' Rule 30(b)(6) notice. To the extent Credit Lyonnais withholds documents and responses on the basis of asserted attorney-client and/or attorney work-product privileges, Credit Lyonnais shall provide a privilege log identifying those documents and responses and the basis for withholding them, also by *March 24, 2008*.

**SO ORDERED.**